## THE PEOPLE *v.* BONNEY.

WHERE defendant was convicted of murder, and on motion for new trial, it appeared that three of the trial jurors, after their retiring but before verdict, went for a few moments to a privy, accompanied by the Under Sheriff, who testified that during their absence from the jury-room they had no communication with any one, nor with each other: *Held*, that the separation of the three jurors from their fellows was not cause for new trial.

*The People* v. *Backus* (5 Cal. 275) on this point goes to the verge of if not beyond the true rule; but that case does not conflict with the decision here.

Where, under section two hundred and ninety of the Criminal Practice Act the jury, during a trial for murder, are permitted to *view* the scene of the alleged crime in custody of the Sheriff, without the presence of the prisoner: *Held* not to be error; and that this "view" is not any part of the *trial* within the meaning of the statute requiring the presence of the prisoner on such trial.

*Held, further*, not to be good reason for setting aside the verdict, that the Court permitted the jury during such trial to withdraw to the front of the Court House in custody of the Sheriff, and without the presence of the prisoner to view a "buggy" as to which a witness was testifying, and in which the prisoner and deceased drove off together on the day of the alleged murder, particularly as the prisoner neither objected to the "view," nor asked permission to accompany the jury.

It is discretionary with the Court to permit the jury to make this "view," and possibly the Court would grant the prisoner the same right.

Where, on trial upon an indictment for murder, the jury returned into Court and said they had agreed upon a verdict, which, on being read by the Judge, was found to be: "We, the jury, find the prisoner guilty as charged in the bill of indictment," and the Judge thereupon, without communicating to the prisoner or his counsel the nature of the verdict—they being present and demanding it—told the jury verbally that their verdict was not in proper form, and that they must retire and designate in their verdict in which degree they found the prisoner guilty, and the jury then retired and shortly returned with a verdict specifying that they found the prisoner guilty of murder in the first degree: *Held*, that this verbal direction to the jury to retire, etc., was not a

charge necessary to be in writing; that it amounted to nothing more than a direction to the jury that they must act—must find a verdict on the issue, which was whether defendant was guilty, and if so, in what degree.

It is not error for the Court to permit a witness to be sworn for the prosecution, although his name was not indorsed on the indictment.

Where, in a criminal case, it is objected to the charge of the Court, that it, in some parts, assumes the guilt of the prisoner, or assumes as proven certain disputed points of fact, and there is no statement of facts in the record, the Supreme Court will not interfere unless the ruling of the Court below cannot be maintained under any imaginable state of facts. In such case, all presumptions are in favor of the correctness of the acts and rulings below.

But in this case the charge of the Court is not objectionable in the respects claimed by appellant. (See his point.)

APPEAL from the Third District.

Indictment for murder. The facts as to the first assignment of error considered in the opinion are, as testified to by the Under Sheriff who had charge of the jury, that after the jury had retired, he conducted three of their number, at their request, to a privy just around the corner of the Court House ; that no other person was there at the time, and that the jurors, from the time they left the room till their return, had " no communication by writing or otherwise among themselves or with any other person ;" that the other jurors were left in the jury-room, the door of which he, the Under Sheriff, locked, and the key of which he kept during the absence of the three—the room being left in the charge of a Deputy Sheriff who had also been sworn to take charge of the jury ; and that the absence of the jury was for about two minutes.

The facts as to the second and third assignments are, that upon application of counsel for the prosecution, and at the request of the jury, the counsel for defendant not objecting, the jury were permitted by the Court " to repair in a body under the charge of the Sheriff to the front of the Court-room, for the purpose of examining: a ' buggy ' in the possession of Michael O'Grady, a witness upon, the stand—the ' buggy' to be pointed out to the jury by the witness — alleged to be the same used by Bonney (defendant) and Hirsch (deceased) on the thirteenth day of January 1861— the date of the alleged killing ;" and that upon application of counsel for the prisoner—counsel for the people not objecting— the jury were permitted to go in a body under charge of the Sher--

iff, to the place where the crime was alleged to have been committed—some six miles from the Court House—and to examine it and the localities in the neighborhood thereof, to be pointed out by two persons named Walker and Grant.

The prisoner does not seem to have been present on either occasion. The bill of exceptions does not state whether he was present or absent; but an affidavit of one of the defendant's counsel, on motion for new trial, avers that defendant was not present. The mode of conducting the jury to the scene of the alleged murder, as appears from an affidavit by the Sheriff on said motion, was this: the Sheriff procured a wagon and three buggies and put six jurors in the former and two in each of the latter, and then proceeded with the jury to the spot; the time consumed being about three hours, and the jury not speaking to any outside person.

The facts as to the fourth assignment are, that after the written charge of the Court, the jury retired and subsequently came into Court, and upon being asked if they had agreed on a verdict, the foreman replied " Yes," and handed a paper to the Court. The paper read: " We, the jury, find the prisoner guilty as charged in the bill of indictment," whereupon the Court verbally stated to the jury as follows: " Your verdict is not in proper form. You must retire and designate by your verdict in which degree you find the prisoner guilty." Whereupon the jury again retired, but while they were in the act of retiring, defendant's counsel stated that they objected to the jury retiring, because their verdict as handed to the Court was not read, nor were the contents thereof made known to the counsel or the prisoner—both being present. Objection overruled, defendant excepting. The jury then returned with a verdict: " We find the defendant guilty of murder in the first degree, as charged in the indictment." Defendant's counsel objected to its being recorded, on the ground that it was a nullity, for the reason that the first verdict had not been declared or exhibited to the prisoner or his counsel. Overruled and exceptions.

The second contains no statement of the facts, nor of the evidence. The facts, therefore, as to the sixth assignment considered in the opinion must be gathered from the written instructions of the Court, and although the charge is lengthy, it is inserted in full for

People *v.* Bonney.

the reason that the case depended on circumstantial evidence, in reviewing which the Judge uses expressions which the counsel for the prisoner claims to be utterly illegal, and to come within the rules laid down in the cases of *The People* v. *Williams*, (17 Cal. 142) and *The People* v. *Ybarra* (Id. 166). The Court charged the jury as follows :

" For ten days you have listened to the testimony of the numerous witnesses examined, and the arguments of counsel engaged in this extraordinary case.

" Edward W. Bonney, the prisoner, is charged with the murder of Auguste G. Hirsch, on Sunday, the thirteenth of January last, in this county. His guilt or innocence of that crime is the great question which you have been sworn to try according to the evidence.

" Murder is the unlawful killing of a human being with malice aforethought, express or implied.

" Malice aforethought express means, in law, simply a premeditated and settled intention to take the life of a human being.

" Malice aforethought implied is such as is presumed by law from the act of killing, and the weapon or means with which the killing was committed.

" If the prisoner killed the deceased, the law presumes from that fact alone that he did it maliciously or intentionally, unless the circumstances of the killing show some justification or excuse. If no justification or excuse appear from the circumstances, then the prisoner must prove the existence of such circumstances as will mitigate or justify, or excuse the killing.

" Malice is presumed by law from the unnecessary use of a deadly weapon, and from circumstances of the barbarity and cruelty attending the killing.

" The law presumes that what a man does he intended to do, as well as all the immediate and necessary consequences of his act.

" Murder is of two degrees. Murder of the first degree includes all murders perpetrated by means of poison, or lying in wait, or torture, or by any other kind of willful, deliberate and premeditated killing. Murder of the second degree is the unlawful killing of a human being with an intention to do bodily harm, or in a sud-

People *v.* Bonney.

den rencounter, or impulse of passion, disconnected with any previous willful and deliberate intention to kill.

" But every act which apparently must do harm, and which is done barbarously and with a deadly weapon, and without provocation, and of which death is the consequence, is murder in the first degree.

" Now it is contended by the prosecution, that a body was found on Monday morning, the fourteenth of January last, near San Antonio, in this county, and that this body was the body of Auguste G. Hirsch ; that he was murdered the evening previous on the spot where his body was found, and that the prisoner is the party who murdered him.   You perceive, therefore, that you are required to inquire into and decide the following questions.

" Was there a body found near San Antonio, in this county, on the morning of the fourteenth of January last ?   Was it the body of Auguste G. Hirsch, deceased ?   Was his death the result of accident or suicide, or the felonious act of another ?   If his death was occasioned by the felonious violence of another, is the prisoner at the bar the guilty party ?

" No witness saw the deceased die ; no one witnessed the felonious violence which may have caused his death.   No one swears directly that he saw the prisoner inflict the fatal blow which resulted in his death.

" The guilt of the prisoner, therefore, rests upon what is known as circumstantial evidence.   Evidence of this kind may be defined to be all the facts and circumstances which surround the killing of a human being, and point out with reasonable certainty the person who is guilty.   When these facts and circumstances point all one way, and to one person, and to the exclusion of every other hypothesis, such evidence, in the very nature of things, is as conclusive of the question of guilt as the testimony of witnesses who swear directly to it ; and, indeed, in criminal cases, it is frequently the only kind of evidence by which crime is detected and criminals convicted— for those who perpetrate crime, murder especially, shun the presence of men and plan to do it in secret, so as to avoid observation and escape detection.

" There is nothing mysterious in the application of the rules of

People *v*. Bonney.

circumstantial evidence.   From all the facts and circumstances attending the killing of the deceased which are known and proved by the testimony of the witnesses, you are to find the fact that the deceased was murdered, and that the prisoner is the party who committed the murder.

" The conclusion that the prisoner is the person who committed the murder, from all the facts and circumstances surrounding the killing, is the result of a process of reasoning which men exercise in almost every department of society and in the practical affairs of life and experience.

" In almost all cases of direct testimony jurors are called upon to act upon its principles ; for when witnesses swear that they saw a person shoot another with a deadly weapon, and that the person shot fell and died, they do not, nor can they swear that they saw the powder and ball which was forced through the iron tube into the body of the victim.   But jurors, from the fact that he was shot with a deadly weapon and died from the effects of that shot, infer that there was powder and ball in the weapon ; hence, had there not been, it would have been contrary to human experience that the man could have been shot and killed ; and such is the process by which you are in this case to decide the guilt of the prisoner.

" The effect of circumstantial and direct evidence is the same ; *i. e.*, each results in establishing that which is the great unknown fact in controversy.   In the one case, this fact is proved by the direct testimony of credible witnesses.   In the other, it is the natural and irresistible conclusion from the known facts and circumstances which are proved in the case.

" Now, in this case a great number of witnesses have been examined, and testify to their knowledge of the relations existing between the prisoner and the deceased, of all that they observed happening between them in this county on the fatal day when it is alleged the deceased was murdered, the place where and the circumstances under which the body was found, and the statements or declarations of the prisoner, after the finding of the body, in relation to his connection with the deceased on the day when he parted with him in Oakland or San Antonio.   You are the final judges of the credibility of these witnesses, and the weight to which the testi-

mony of each is entitled. In considering these matters, you are to decide them, as all other questions in the case, not according to your own private suspicions or notions, but as jurors, within the range of the evidence of the case, according to your best knowledge and observation in the light of experience and the laws of human knowledge.

" If a witness has sworn falsely to a fact about which he cannot be presumed liable to be mistaken, you should reject his testimony; but a witness is liable to a mistake and the imperfections of human nature as other men, and may make an untrue statement in giving his testimony ; but because he does so, it does not follow that you should reject the whole of his testimony ; discrepancies arise in all human testimony, for all men have not the same powers of attention, observation, recollection and expression.

" It is for you to look at the motives, character and demeanor of each witness, and decide for yourselves what part of it is the result of a mistake, and how much of it is consistent with the known and indisputable facts in the case. The testimony of each witness, which is corroborated by these facts and circumstances, is entitled to its due weight; but if it is not so corroborated, and is inconsistent with them, and self-contradictory and improbable, you can disregard it ; and so it is in relation to the voluntary statements made by the prisoner about the deceased and his connection with him, and in accounting for the circumstances pointing to himself in connection with him.

"A man's declarations are always admitted in evidence against himself ; for the reason, that the law presumes a man will not say anything untrue against himself or his own interests.

" In considering them you are to take them all together, as well those for him as against him ; but every part of his statement or declarations is not always entitled to equal weight. You may, unquestionably, on this, as on all other testimony, believe one part and disregard that which you consider unworthy of belief.

" If his declarations are self-contradictory and inconsistent with the facts and circumstances as they exist, are improbable and unnatural, you can take this fact into consideration in making up your verdict.

" Guided by these rules, it is your duty, within the range of all the evidence in the case, to determine what facts are established by the evidence, and whether they prove to your satisfaction, beyond a reasonable doubt, that the prisoner is guilty of the crime with which he is charged ; for, as I have before said, if you find as a fact that the deceased was murdered, the guilt of the prisoner is the great fact for your consideration, from all the facts and circumstances proved in connection with his murder.

" That question is not to be decided by you by any one or any number of the facts and circumstances proved, separated from the remainder ; but after determining what have been proved, you should collect them all together, and in this collected state, all should be consistent and complete in themselves, and prove to a reasonable certainty that the prisoner, and no other person, perpetrated the crime.

" All the facts and circumstances in a case of this kind, collected and connected together, are compared in law to a chain, formed by its links connecting one with the other.   You cannot separate any one of them from the other for the purpose of examining and weighing its force apart from the rest, but you must pass upon them all collectively ; and if you find one end of that chain connected with the murder of the deceased, and the other with the prisoner at the bar—in other words, if you believe from the evidence that the deceased was murdered, and that the prisoner murdered him, the case is fully made out, and it is your duty to convict.   But if any one of them is inconsistent with the hypothesis of his guilt, the chain of circumstantial evidence is said to be broken, and the charge fails. You are then to determine :

" 1st. What facts and circumstances are clearly, distinctly and indisputably proved by the evidence in the case ?

" 2d.  Do these facts and circumstances prove that the deceased was murdered ?

" 3d.  Do they prove to a moral certainty that the prisoner is the person who murdered him, or are they consistent with any other rational supposition ?

" The hypothesis of the prisoner is, that two Frenchmen, who, it is alleged by him, were in company with the deceased when he

last saw them, near San Antonio, on the Sunday of the murder, may have murdered the deceased.

" Does that hypothesis account for the facts and circumstances proved by the evidence in this case, judged by the light of reason and the laws of nature—if so, to what extent ?

" If it accounts for them with greater reason than the hypothesis of his guilt, or with reason equal to that of his guilt, of course you ought to acquit ; or if the hypothesis of his innocence is provable against only a greater probability on the side of his guilt, you should acquit.

" But if this hypothesis does not account for the facts and circumstances, and is inconsistent with them, or the great mass of them, or with those of a leading character, and you believe from the evidence that the facts and circumstances surrounding the murder of deceased exclude that hypothesis, and every other than the guilt of the prisoner, you have no other alternative than to convict.

" In connection with the hypothesis put forward by the prisoner, and the question of his own guilt, it will be your duty to inquire from all the evidence in the case :

" 1st. Whether the prisoner and the deceased came from San Francisco on Sunday morning, the thirteenth of January last, across the bay in the ferry-boat to Oakland, in this county ?   Did the prisoner on that morning hire a horse and buggy from the livery stable of O'Grady, in Oakland—if so, for how long ?   Did the prisoner and the deceased drive with that horse and buggy from the stable out on the San Pablo road and back again to the plaza in Oakland ?   Did the deceased stop with that horse and buggy at the plaza while the prisoner went to make some purchases of cakes or wine, or both ?   Did two Frenchmen approach the deceased in the buggy during the absence of the prisoner, and did the prisoner upon his return to the buggy at the plaza find two Frenchmen there in conversation with the deceased—if so, in what language did they converse, and could the prisoner understand the language ?

" 2d. Who there and then got into that buggy, and remained in it, or with it, during the whole of that Sunday, until it was returned in the evening to the stable of O'Grady ?   Was it the prisoner and

the deceased and the two Frenchmen who got into the buggy there, and was one of the Frenchmen tied in and to the buggy with the neck ties of prisoner and the Frenchman? Did they all four in it drive from the plaza in Oakland, or out on the San Pablo road any distance, and turn and drive back to Oakland, across the Oakland bridge, and on to the brow of the hill descending to San Antonio? If so, did the deceased and the two Frenchmen get out of the buggy at that place; and did they part from the prisoner at that place; and did the prisoner take the horse and buggy and drive towards Oakland? If so, at which time? Was that time of day the last time the prisoner and deceased were together on that Sunday? Did the prisoner, after parting from the deceased and two Frenchmen, drive towards Oakland bridge, miss the key of deceased's store, return and drive to San Antonio in search of deceased, and fail to find him, and drive back towards Oakland and get lost, and fail to get back to the livery stable, until the hour in the evening at which he returned to it alone?

" 3d. Or did the prisoner and the deceased alone get into the buggy at the plaza in Oakland, after the prisoner had made his purchases, and drive out with the horse and buggy for the second time that day? Were they seen, during that second drive, on the San Pablo road? If so, did they drive together with that horse and buggy back again on the San Pablo road to Oakland, and over the Oakland bridge towards San Antonio? Were they seen driving over the Oakland bridge towards San Antonio, and instead of going to San Antonio, did he return towards the Oakland bridge, and instead of going over the bridge, did the prisoner with the deceased turn and drive towards the residence of Mr. Grant? Did the prisoner stop with that horse and buggy at the corner of Mr. Grant's fence? and was the deceased in it at the time? If so, at what time of the day, and how long did they remain there with the horse and buggy, and what was the condition of the deceased? Was he helpless, or stupefied from any cause, by the agency of the prisoner, and what was the conduct of the prisoner in that buggy on that occasion? Did the prisoner, while there, or at any other time, take his own neck tie and the neck tie of the deceased, and with them bind the deceased in the buggy for any purpose? Did

the prisoner, upon the approach of a woman towards the horse and buggy, drive away from that place with the deceased bound, and in a stupefied condition, around some vacant lots of the town of Clinton, and into the main road towards San Antonio? Was the prisoner seen driving towards and through the town of San Antonio with the deceased in that condition? Was he seen afterwards with the same horse and buggy, and the deceased in a stupefied condition in it, driving out on the old San José road, past the house of Mitchell and in towards Eden Valley?

" Did he return, and drive back along the same road to the place where the body of the deceased was found on the next morning? Were the horse and buggy, the prisoner and the deceased at that spot on that fatal evening? Did the prisoner there and then take the deceased from the buggy, place him upon the ground where his body was found, and feloniously inflict upon him the wounds which caused his death? If so, was the prisoner seen passing along the road through San Antonio immediately afterwards alone with the same horse and buggy, and on towards and through Oakland to the stable of O'Grady, and at what hour did he arrive?

" If, after making these inquiries, by the light of all the evidence in the case, and satisfying yourselves of all the facts and circumstances proved by it, you believe that the hypothesis of the two Frenchmen is false, and fabricated to conceal the guilt of the prisoner, and if you believe that all the facts and circumstances are consistent with the supposition that the prisoner is guilty, and that the prisoner can offer no resistance to that, except that no man would be guilty of so atrocious a crime as that with which he is charged, that cannot much influence your minds, for we all know that crimes are committed, and therefore the existence of the crime is no inconsistency with the other circumstances, if those circumstances lead to that result.

" The point for you to consider is, whether, attending to all the evidence, you can reconcile the circumstances adduced in the evidence with any other supposition than that he has been guilty of the offense.

" If you cannot, it is your bounden duty to find him guilty. If you can, you will give him the benefit of such doubt. All that can

be required is, not absolute proof, but such proof as convinces you that the crime has been made out.

"The law presumes every man innocent until there is proof of his guilt, and if from the evidence there arise a reasonable doubt of it, he is entitled to the benefit of it; but this doubt is not such an one as arises from inattention to facts, from undue sympathy, or sensibility from trivial or fanciful suppositions, or remote conjectures as to facts being so and so. No juror has a right to look beyond his own duty at the consequences of his verdict. To do so, is a virtual violation of his oath, and an offense against society, tending to the disparagement of Justice and the encouragement of crime.

"If you find the prisoner guilty, you will designate by your verdict in which one of the degrees.

"If you find him not guilty, you will simply say so."

Verdict of guilty.   Defendant appeals.

*Elisha Cook*, for Appellant.

I.   Three of the jurors, without leave of Court, separated from their fellows after they had retired to the jury room for the purpose of deliberating upon their verdict, and for this reason a new trial should have been granted. (Wood's Dig. 304, sec. 440; *People v. Backus*, 5 Cal. 275.) The presumption is that any separation is prejudicial, or the common law and the statute after it would not have provided so carefully against it. See on the construction of this statutory right the conclusion of Justice Baldwin's decision— Justice Field concurring—in the *People v. Ah Fong* (12 Cal. 345).

II.   The charge of the Court was wrong, because in effect it assumed as a fact that a crime had been committed, and that Bonney was the guilty party. The charge contains expressions calculated to prejudice the case of the prisoner before the jury. (*People v. Williams*, 17 Cal. 142; *People v. Ybarra*, Id. 166; *Reel v. Reel*, 2 Hawks, 63; 1 Id. 309; 7 Leigh, 751; 4 Dev. 257; *People v. Gibson*, 17 Cal. 283; *People v. Jenkins*, 16 Id. 431; *People v. Ah Fung*, Id. 137; *People v. Carabin*, 14 Id. 438; 18 Me. 436; 9 Humph. 411; 36 Eng. L. & E. 431; Whar. Cr. Law, 3115, 3119.)

1. The Judge sets out with telling the jury that this is an extraordinary case; and 2d, that "his guilt or innocence of *that crime*," thereby assuming that a crime has been committed.

3. He says, " malice is presumed from the unnecessary use of a deadly weapon, and from circumstances of the barbarity and cruelty attending the killing.    The law presumes that what a man does he intended to do, as well as all the immediate and necessary consequences of his act."    This intimates that Bonney had done some barbarous and cruel act; and it is clearly error to charge that " malice is presumed from the unnecessary use of a deadly weapon." (1 Snead. [Tenn.] 407.)

4. The Judge says :  " No witness saw the deceased die ; " and goes on charging a series of facts, all of which the Constitution and the decision in the *Ybarra case* (17 Cal.) prohibit.    It may be urged that the word " witness " refers to witnesses who testified in the case.    This would still be charging a " fact ; " and besides, it was a theory of defense, that two Frenchmen did the murder, and that one of them was a witness, an important witness, against the accused.    The charge excludes any hypothesis of this kind, just as speaking of " that crime " before, excludes the hypothesis that the homicide was justifiable or excusable.    The expression " no witness " was also equivocal and objectionable under the ruling in the case of Williams, above cited.

5. The Judge assumes the fact that Hirsch was dead, one of the facts upon which the jury were to pass, by using the expression "Auguste G. Hirsch, deceased," and speaking of his " death."

6. He says : " The guilt of the prisoner, therefore, rests upon what is known as circumstantial evidence." Here, guilt is assumed.

7. He says : " No one swears directly that he saw the prisoner inflict the fatal blow ; " thus assuming that there was a fatal blow inflicted by the prisoner.

8. The definition of circumstantial evidence, in connection with the sentence preceding it, assumes or suggests the guilt of the prisoner.

9. The paragraph commencing; " When these facts," is a special plea or argument against the prisoner.    The pretended rule of evidence laid down in the same paragraph is not only not law, but it was very prejudicial to the accused ; for it was equivalent to saying that the circumstantial evidence in this case was as strong against Bonney, as conclusive that he committed murder, as if wit-

nesses saw him do it. The words : " murder especially," " avoiding observation," " shunning the light," &c., &c., could not otherwise than prejudice the jury against the accused.

10. The Judge ought not to have used the word " mysterious," as applied to the application of the rules of circumstantial evidence in this case.

11. The Judge says :." You are to find the fact that the deceased was murdered, and that the prisoner is the party who committed the murder." This was saying that the jury must convict the accused.

12. The Judge says : " The conclusion that the prisoner is the person who committed the murder from all the facts and circumstances surrounding the killing, is the result of a process of reasoning which men exercise in almost every department of society and in the practical affairs of life and experience." This is still broader and more objectionable than the previous sentence.

13. The illustration of shooting a person is a misstatement of the law, and was, under the circumstances, prejudicial to the accused. According to that, there can be no such thing as direct evidence. It was equivalent to saying : " Gentlemen, you could not possibly have stronger evidence of Bonney's guilt than you have here. If you had seen him plunge a dagger to Hirsch's heart, it would only be on circumstantial evidence that you could find that he killed Hirsch. And therefore, you perceive circumstantial evidence leaves no doubt in the mind."

14. The Judge says : " Such is the process by which you are in this case to decide the guilt of the prisoner."

15. He uses the words " known facts," directing the jury to take them into consideration as distinguished from " proved facts." The jury had no right to consider any fact not in evidence. Even a fact known to a juror could not be considered, unless put in evidence. A fact learned on viewing the place of the homicide could not lawfully be considered without being placed in evidence. The only object of a " view " is, not to learn facts, but to enable the jury the better to understand the testimony.

16. The Judge assumes that there were " relations existing between the prisoner and the deceased," and that things " were "

observed happening between them in this county on the fatal day," and so on.  He charges as established facts many things relied on by the prosecution as links in the chain of evidence, but controverted by the defense.

17.  The Judge precludes the jury from exercising their " private suspicions or notions."  If they suspected that the Frenchman committed the murder they must not consider it, because the suspicion is not public.

18.  We object to what the Judge says about not rejecting the whole of the testimony of a witness who makes an untrue statement. He should have cautioned the jury that such a witness might be mistaken in more than one respect.  As a matter of fact, it was a special plea against the prisoner, because various witnesses were shown to have made untrue statements.

19.  The Judge speaks of the " undisputed facts."  The accused made no admissions.  He disputed everything.  But the Judge goes on to speak of testimony being corroborated by these " undisputed facts," and therefore entitled to weight.

20.  In speaking of the declarations, the Judge virtually assumes that the case has been made out, and that the jury are to test the declarations by the " facts and circumstances as they exist."

21.  The Judge speaks of the guilt of the prisoner as the great fact, or as he expresses it in another place, the great unknown, for the consideration of the jury, and then goes on to charge that the jury shall not decide the question by any one or any number of the facts and circumstances proved separated from the remainder.  This is as much as to say : " Gentlemen, this is an extraordinary case of circumstantial evidence.  If the accused proves that he left Hirsch and the two Frenchmen together and returned alone to Oakland, you must not decide the question on that, but you must take all the testimony and all the circumstances."

22.  In speaking of the supposed chain, one end of which is connected with the murder and the other with the defendant, the Judge continues to charge strongly against the defendant, makes no qualifications, and virtually precludes any other than a verdict of murder in the first degree.

23.  The Judge charges that the jury must be satisfied to a

People *v.* Bonney.

"moral certainty." We object to this word "moral." Hardly ever is there a murder committed, but that everybody satisfies himself to a *moral certainty*, in the meaning in which these words are generally used, as to who did it.

24. The Judge assumes that the murder was committed on Sunday. The dead body was found on Monday morning about sun-up, say about six o'clock. Bonney was shown to have returned to Oakland early Sunday evening, and remained there all night, perfectly unconcerned, playing billiards and laughing and talking. To convict him it was absolutely necessary that the murder should have taken place on Sunday. There was no evidence of this, and the Judge had no right to charge that the murder, if there was murder, did not take place on Monday morning.

25. After excluding from all the first part of the charge the hypothesis of the two Frenchmen, the Judge remarks that there is such a hypothesis, and calls it *the* hypothesis. He excludes all other hypotheses.

26. He requires the hypothesis of the two Frenchmen to account for the facts with greater reason than, or equal reason with that of Bonney's guilt, thereby excluding what the law regards as a reasonable doubt.

27. He requires, if the hypothesis of the two Frenchmen be inconsistent with the facts and circumstances, " or the great mass of them, or with those of a leading character," that the jury shall convict. This was calculated to mislead the jury. The facts and circumstances must refer to the points of the case for the prosecution; any defense must necessarily be inconsistent with the great mass of them, or with those of a leading character.

28. The use of the words " murder of the deceased," and " his own guilt," is objectionable, for the same reason that this Court objected to the use of the word " victim " in the case of Williams (17 Cal. 142).

29. The Judge again excludes all other hypotheses but that of the two Frenchmen, and then directs the jury to inquire whether the prisoner did so and so, setting forth the whole argument of the prosecution in a most effective manner. He says, for instance, " who there and then got into that buggy and remained in it, or

29

with it, during the whole of that Sunday," and so on, assuming as facts many of the points which it was necessary for the prosecution to make out.   We would also call attention to the part referring to the buggy at Grant's fence : " What was the conduct of the prisoner in that buggy ?   *   *   Did the prisoner take his *own* neck tie ?   *   *   Were the horse and buggy, the prisoner and the deceased at that spot on *that fatal evening ?* " etc., again assuming, to the prejudice of the accused, that Hirsch was murdered in the evening.   After assuming this, the Judge asks : " Was the prisoner seen passing along the road through San Antonio *immediately* afterwards alone ?"

30. The Judge does not exactly say that " the hypothesis of the two Frenchmen is false and fabricated to conceal the guilt of prisoner ;" but the improper, uncalled for and unnecessary use of such words showed the jury that such was his opinion.

31. In the same clause he again excludes reasonable doubt in speaking of the consistency of the facts and circumstances with the *supposition that the prisoner is guilty*, and so on to the end of the paragraph, where he says : " Therefore the existence of the crime is no inconsistency with the other circumstances, if those circumstances *lead to* that result."

32. He excludes a reasonable doubt in the conclusion of the next paragraph.   " All that can be required is not absolute proof, but such proof as convinces you that the crime has been made out," and the harm done is not helped by the definition of what a reasonable doubt is not, which follows.

33. Returning to the beginning of the charge, the Judge says : " Malice aforethought implied is such as is presumed by law from the act of killing and the weapon or means with which the killing was committed."   This is not good law, for according to it, malice would be presumed in every case of homicide.   There was not a particle of evidence to show that Bonney ever had any ill will or malice against Hirsch.   This charge about malice was therefore not only contrary to our statute, (Wood's Dig. 331) but directly prejudicial to the accused.

III.   The Court below committed error also in giving a verbal instruction to the jury to retire again and find the degree.   (Wood's

Dig. 298; *People* v. *Beeler*, 6 Cal. 246; *People* v. *Payne*, 8 Id. 341; *People* v. *Demint*, Id. 423; *People* v. *Ah Fong*, 12 Id. 345; *People* v. *Woppner*, 14 Id. 437.)

IV.   The bill of exceptions shows that the accused was not present, but on the contrary was confined in his cell at the time that the jurors viewed the premises.   Nor does it appear that any counsel of the accused was present.   The accused had a right to be present then as well as during any other part of the trial, and could not waive that right.

V.   There was error in the Court overruling the objections to the examination of witnesses, whose names were not indorsed upon the indictment, and no notice of an intention to call them having been given to the prisoner or his counsel, and the prisoner and his counsel stating at the time that they were taken by surprise.   The prisoner had a right to know what witnesses would be called, and to have an opportunity to investigate their character and to prepare to meet the testimony they might give against him.

*John V. Wattson*, also for Appellant.

*Thos. H. Williams, Attorney General*, for Respondent.

I.   The separation of the three jurors from their fellows was not an error, unless it appears that they were tampered with, or there was an opportunity of tampering with them.   (*People* v. *Backus*, 5 Cal. 207, and authorities there cited by the Attorney General; *People* v. *Lee*, 17 Cal. 79.)

The record shows affirmatively that the jurors were not tampered with, and that there was no opportunity of its being done.

II.   As to the "views" had by the jury, the record shows that the jurors were kept together—that is, in sight—and all under the eye and the control of the officer having them in charge; consequently there was no separation.   There are three answers to the objection urged by the other side.

1st. It does not appear from the record that the defendant was not present at the view.

2d. The statute does not require, authorize or contemplate the presence of the prisoner or the District Attorney.   (Crim. Prac.

444 SUPREME COURT—OCTOBER TERM, 1861.

Act, sec. 390.) The proper course is to place the jury under the Sheriff, and send with them a person selected to point out the premises, and after their return to examine the party sent as aforesaid, if deemed necessary. Again, section three hundred and sixty-two, in declaring the order in which the trial shall proceed, does not mention a view. When, therefore, by another section, the prisoner is required to be present during the trial, the term is used in its technical sense, as defined by section three hundred and sixty-two, and consequently the view is not a part of the trial, at which the defendant must be present.

3d. If the prisoner was, within the meaning of the statute, absent during a part of the trial, it must appear that some injury resulted to him in consequence of his absence to justify a reversal for that reason. (*People* v. *Bealoba,* 17 Cal. 460.)

III. It is objected that a person was appointed by the Court to point out a buggy and the premises viewed by the jury. This course is expressly authorized by statute. (Crim. Prac. Act, sec. 390.)

IV. The charge of the Court will sustain itself. In declaring the law, it keeps within rules well established by this Court in *People* v. *Bealoba,* and other cases; and in stating the evidence, the constitutional right of the Judge is not transcended.

It is not true, as contended by the other side, that the Judge tells the jury to convict the defendant. It will be found, on the contrary, that every statement made by him is hypothetical in terms, or clearly is in meaning, and could not have been misunderstood by the jury.

Neither was it error to instruct the jury that they might receive or reject portions of the defendant's confession, according to their belief or disbelief of the same, after a careful consideration of all the facts of the case. (*People* v. *Wyman,* 15 Cal. 70.)

V. The jury came into Court with an informal verdict, and the Court ordered them to retire and correct it.

This was not an instruction or charge, which is required to be in writing, but was a mere direction to the jury, which it was not only the right, but the duty of the Judge to give. (*People* v. *Marquis,* 15 Cal. 38.)

VI.    It was not error to permit the examination of witnesses whose names were not indorsed on the indictment.

' If defendant was surprised by their examination, he should have moved a continuance upon that ground.    (*People* v. *Freeland*, 6 Cal. 96.)

BALDWIN, J. delivered the opinion of the Court—COPE, J. concurring.

The defendant was convicted of the crime of murder in the first degree.    His counsel assigned several errors, which we shall consider in their order.

1.  The first is, that three of the trial jurors separated from their fellows after the jury had retired, and before the return of their verdict.    This assignment seems to rest on the fact that these jurors retired for a few moments to a privy, and the Under Sheriff who accompanied them testifies, that during their absence from the jury room, they held no correspondence with any one, nor with each other.    The case of the *People* v. *Backus* (5 Cal. 275) is relied on; but that case—which goes to the verge of the true rule, if not beyond—does not support the assignment; for the Court say, the correct rule is to grant a new trial on account of the separation, if it were such as that the jury might have been improperly influenced. Here the facts show that the jurors were in the custody of the officer, and not only is there no probability, from the circumstances, of any improper interference, but express proof, uncontradicted, that there was none.    (See *People* v. *Lee*, 17 Cal. 78.)

2.  It is assigned that the jury should not have been permitted to view the scene of the alleged murder, except in the presence of the prisoner, this view being a part of the trial, in the theory of the' counsel, and the prisoner required to be present during the entire progress of it ; and,

3.  That the jury were permitted to see the buggy, as to which testimony was given.    We see nothing in these two points requiring a detailed notice.    The Court had the discretion to permit the jury to view these physical objects ; and this was neither in contemplation of the act or otherwise any part of the trial.    It was rather a suspension of the trial to enable the jury to view the ground, etc.,

that they might better understand the testimony. We do not see what good the presence of the prisoner would do, as he could neither ask nor answer questions, nor in any way interfere with the acts, observations or conclusions of the jury. If he had desired to see the ground that he might be assisted in his defense by the knowledge thus obtained, possibly the Court would have granted him the privilege ; but the fact that the jury went upon the ground without being accompanied by him is no good reason for setting aside the verdict, especially as he neither made objection nor asked permission to accompany them at the time.

4. It is next urged, that the Court erred in telling the jury orally to return when they brought in a general verdict of guilty—as it is said—and " to find " in what degree " or the degree." It is said that this direction was a charge, and ought to have been in writing. We think not. Their answer was not a finding, but a failure to find. The duty of the jury remained undischarged. They were still under the control of the Court. The Court did not direct them as to the law of the case ; it only told them that they must act— that they, in other words, must find a verdict on the issue, which was, whether the defendant was guilty, and if guilty, in what degree. This was no more a charge than if the Court, immediately after the argument, had told them to retire and consider of their verdict.

5. It was not error for the Court to permit a witness to be sworn for the prosecution, because his name was not marked on the indictment. It often happens that the necessity for introducing particular witnesses arises on the trial ; and justice would be greatly impeded if the rule invoked were affirmed, while no corresponding advantages would accrue from it.

6. The last objection is, that the Judge erred in sundry particulars in assuming the guilt of the prisoner, or assuming for proven certain disputed points of fact. There is no statement of facts ; and it would be difficult for us to say that the Court erred in its assumption ; for all presumptions are in favor of the correctness of the acts and rulings of the Judge. We only interfere to correct an erroneous instruction on appeal where the facts are not stated, when under no imaginable state of facts could the ruling of the

Judge be maintained. But apart from this objection, we see nothing in the charge in the respects criticised which sustains the assignment.

Judgment affirmed, and the Court will fix a time for the execution of the sentence.