STATE OF OREGON, RESPONDENT, v. AH LEE, APPEL-
LANT.

HOMICIDE — VIEW OF PREMISES BY JURY—PRESENCE OF DEFENDANT—
WAIVER. —Where, on a trial for murder in the first degree, the court,
upon the application of the state, directed a view of the place of the al-
leged killing by the jury: Held, that the omission by the court to provide
for the presence of the defendant or his counsel at the view, no applica-
tion therefor having been made by the defendant or his counsel at the
time the view was ordered, was not error.

DYING DECLARATIONS—BELIEF IN THE CHRISTIAN RELIGION.—In order to
render dying declarations admissible, it is not requisite that the deceased
should have been a believer in the Christian religion at the time the dec-
larations were made.

JURY MAY CONSIDER PROBABILITIES.—In determining the credibility of a
witness, the jury may judge whether the statements made by the wit-
ness accord with their own experience in life, and their own knowledge
of the motives, and interests, and passions which ordinarily influence
men under such circumstances as those which surround the witness.

DELIBERATION AND PREMEDITATION—INFERENCE FROM FACTS.—Direct proof
of deliberation and premeditation is not required, but may be inferred
from proven facts.   Three men, all armed with deadly weapons, made a
simultaneous attack upon a third, in a Chinese Joss-house, and killed
him—one having approached the deceased from behind, and without say-
ing a word, struck him a deadly blow on the head with a hatchet, while
the others fired two shots into his body in rapid succession: Held, that
these facts warranted the jury in concluding that the killing was pre-
concerted, and that the design to take the life of the deceased was formed
in cool blood.

APPEAL from Multnomah County.

On the twenty-fifth day of October, 1878, the appellant
was jointly indicted with Lee Jong and Charlie Lee Quong
for the murder of Chin Sue Ying. Lee Jong was never ar-
rested. The others, the appellant and Charlie Lee Quong,
were tried together, and convicted of murder in the first de-
gree, and sentenced to be hanged on the seventh day of
February, 1879. They appealed from the judgment to the
supreme court at the January term, 1879. The judgment
of the circuit court was reversed, and the case remanded for
a new trial. The defendants then severed in their trials,
and on the tenth day of July, 1879, the appellant was again
tried and convicted of murder in the first degree, and sen-

tenced to be hanged, from which judgment he again appealed
to this court.

The evidence offered on behalf of the state tended to
prove that on October 2, the day preceding the homicide,
Charlie Lee Quong, one of the accused, complained to a
policeman that the deceased had poured some offensively
smelling liquid on the floor of the Joss room, and that he
would have him arrested for it on the morrow. That the
next day in the afternoon, while a number of Chinese were
in the Joss-house, the deceased was standing on the floor
with his back toward the appellant, when the latter raised
a hatchet and struck the deceased a blow on the head with
it. Deceased suddenly turned with his face toward the ap-
pellant, and while turning, he was shot twice by the other
defendants, Lee Jong and Charlie Lee Quong, and imme-
diately fell on the floor. The deceased had three wounds
on the head, inflicted with a hatchet, and two in the body,
made by pistol shots, either of which was regarded as nec-
essarily fatal. From the effect of these wounds he died two
days afterwards. There was also evidence tending to show
that the appellant was seen to walk rapidly away from the
Joss-house soon after the assault was made, and that he had
apparently something concealed in his sleeve. The deceased
became unconscious from the effect of the wounds, and re-
mained so until the next day, when consciousness returned,
and he was then questioned as to who inflicted the wounds
upon him. He replied through a Chinese interpreter, to
the effect that the appellant cut him and Charlie Lee Quong
shot him. These statements were given when deceased be-
lieved he would die from the effect of the wounds, and were
afterwards, during the trial, received in evidence as his dy-
ing declarations.

In his defense, the appellant offered evidence tending to
prove that he was at home, sick in bed, at the time deceased
was wounded; also the testimony of several Chinese wit-
nesses to the effect that the deceased had come into the
Joss-house having a piece of raw meat in his hand, which
he was about to throw on the Joss, when Lee Jong, one of
the persons named in the indictment (not arrested), ob-

serving the action of the deceased, sprang at him and caught his arm, drew the hatchet from under his clothing and struck deceased with it, and then drew a pistol and shot him twice; but that neither the appellant nor Charlie Lee Quong participated in the killing of the deceased. There was no evidence offered or received on the trial as to whether the deceased believed in a future state of rewards and punishments, or to show whether he had any religious convictions whatever on the subject. It was proved that the deceased, and the witnesses who testified on behalf of the state that they saw the appellant strike him, were Chinese, and had attended the Chinese mission school in Portland; while all those accused in the indictment were worshipers of Joss.

After the evidence for the state was closed, on motion of the district attorney, an order was made by the court allowing the jury, accompanied by a bailiff having them in charge, to visit and view the premises and the Joss-house where the wounding of the deceased took place. The order made did not direct or provide for the presence of the appellant or his counsel at the view, and neither of them asked that they might be permitted to be present, and neither did the order exclude them from being present at the view if they had desired it.

*Dolph, Bronaugh, Dolph & Simon, and Whalley & Fechheimer,* for appellant.

*John F. Caples, District Attorney, and M. F. Mulkey,* for the state.

By the Court, KELLY, C. J.:

After the evidence on behalf of the state was closed, the court, at the request of the district attorney, made an order directing a bailiff to conduct the jury to the Joss-house for the purpose of viewing the place where the homicide occurred. The appellant and his counsel were present when the order was made, but did not object to it. The section of the statute under which the court ordered the view is as follows: "Whenever, in the opinion of the court, it is

proper that the jury should have a view of real property which is the subject of litigation, or of the place in which any material fact occurred, it may order the jury to be conducted in a body, in the custody of a proper officer, to the place, which shall be shown to them by the judge or by a person appointed by the court for that purpose. While the jury are thus absent no person except the judge or the person so appointed shall speak to them on any subject connected with the trial." (Code, p. 145, sec. 195.)

It is now claimed by the counsel for appellant that the court erred in permitting the jury to visit the premises where the homicide took place in the absence of the appellant; that in making their view the jury necessarily received evidence from inanimate objects which might be prejudicial to the rights of the deceased, and it is urged that his failure to object to the making of the order for the view, was no waiver of his right to be present. The decisions of the courts in the different states are in direct conflict with each other on these points; but we consider the better doctrine to be that the failure of the accused to be present when the jury were making their view, is no ground of error. We are unable to see what good his presence would do, as he could neither ask nor answer any questions, nor in any way interfere with the acts, observations, or conclusions of the jury. He would have been only a mute spectator while he was there.

It appears from the records that when the district attorney moved the court for a view by the jury, the counsel for the accused stated that they were about to make the same motion. The appellant, if he desired to be present at the view, should then have made application for that purpose. If he had desired to see the place where the homicide took place, in order to be better prepared to make his defense, doubtless the court would have permitted him to accompany the jury in the custody of an officer. But failing to make known any desire to be present at the view, he must be deemed to have waived any privilege which he had in this respect. It was so decided in a well-considered case by the supreme court of Kansas, and to the principles laid down

there we assent. (*The State* v. *Adams*, 20 Kansas, 311; *People* v. *Bonney*, 19 Cal. 426.)

The next objection urged is that the court erred in admitting the dying declarations of the deceased to go as evidence to the jury against the accused, and in support of this objection it is urged that as the deceased was shown to be a Chinaman, it must be presumed that he was a worshiper of Joss, and had the heathenish religion of his race, and that there was no evidence that he had any convictions in regard to a future life, or a moral accountability to a supreme being after death, or that he had any fear of future punishment in another world for false dying declarations made in this. Mr. Greenleaf in regard to dying declarations says: "The persons whose declarations are thus admitted are considered as standing in the same situation as if they were sworn, the danger of impending death being equivalent to the sanction of an oath. It follows therefore that where the declarant, if living, would have been incompetent to testify by reason of infamy or the like, his dying declarations are inadmissible. And as an oath derives the value of its sanction from the religious sense of the party's accountability to his Maker and the deep impression that the declarant was incapable of this religious sense of accountability, whether from infidelity, imbecility of mind, or tender age, the declarations are alike inadmissible." (1 Greenleaf, sec. 157.)

Under the common law, one who does not believe in the existence of a Supreme Being who will punish false swearing in a future world, is incompetent to testify, and consequently the dying declarations of such a one would not be admissible in evidence under the common law. But the common law rule has been abrogated in this state: "No person shall be rendered incompetent as a witness or juror in consequence of his opinions on matters of religion, nor be questioned in any court of justice touching his religious belief to affect the weight of his testimony." (Article 1, sec. 6, constitution of Oregon.) As the deceased, under our laws, would have been a competent witness to testify in

a court of justice, it follows that his dying declarations were admissible. (*People* v. *Sanford*, 43 Cal. 29.)

But as a matter of fact it does not appear from the evidence that the deceased was destitute of religious belief, and of a belief in future accountability. The record shows that he had been for some time attending a missionary school in Portland, and it may therefore reasonably be presumed that he had been taught the doctrines of the Christian religion, and that he was a believer in the Christian faith. Indeed, the evidence on the part of the accused tends strongly to prove that the fatal assault was made upon him because he had treated the Joss-house with disrespect and contempt. Under the common law, therefore, we consider that his dying declarations would have been admissible in evidence. We therefore consider that the court did not err in admitting them.

There was also an exception taken to the following sentence in the charge of the court: " You may consider the surroundings of the witness, you may consider the probability of the facts he narrates; whether or not those facts accord with the facts previously known or believed by you; that is to say, whether or not they accord with your experience, or knowledge, or previous belief, or, in other words, with the probabilities of the case."

It is claimed by the appellant that this instruction gave to the jury the right to determine the credibility of a witness by comparing his testimony with any knowledge or information which the jurors themselves may have had concerning the homicide, or opinions which they may have formed in regard to it before they were impaneled to try the case. We do not regard it as open to this construction. Taken altogether, we think that the court intended to convey to the jury the idea that in determining the credibility of a witness, they were to judge whether the statements made by him accorded with their own experience in life, and their own knowledge of the motives and interests and passions which govern or influence men under such circumstances as those which surrounded the witness. We do not consider this instruction of the court open to the objection made against it.

We now come to the principal point relied on by the appellant to reverse the judgment, and which has been most strongly pressed upon the consideration of the court. It is contended "that according to law and the evidence as certified in the bill of exceptions, the appellant is not guilty of murder in the first degree, but in the second degree, conceding that he did participate in committing the homicide as testified by the witnesses for the state." The appellant's counsel, in support of this proposition, claim that there was no evidence whatever tending to show deliberation or premeditation on part of the accused, and that in order to convict, both deliberation and premeditation in the commission of the crime should have been proved beyond a reasonable doubt.

The crime of murder is defined in sections 506 and 507, page 406, of the code as follows:

"Sec. 506. If any person shall purposely, and of deliberate and premeditated malice, or in the commission or attempt to commit any rape, arson, robbery, or burglary, kill another, such person shall be deemed guilty of murder in the first degree.

"Sec. 507. If any person shall purposely or maliciously, but without deliberation and premeditation, or in the commission or attempt to commit any felony, other than rape, arson, robbery, or burglary, kill another, such person shall be deemed guilty of murder in the second degree."

Section 519, page 407, of the code, further provides how the different degrees in the crime of murder shall be proven:

"Sec. 519. There shall be some other evidence of malice than the mere proof of the killing to constitute murder in the first degree, unless the killing was effected in the commission or attempt to commit a felony; and deliberation and premeditation, when necessary to constitute murder in the first degree, shall be evidenced by poisoning, lying in wait, or some other proof that the design was formed in cold blood and not hastily upon the occasion."

Deliberation is that act of the mind which examines and considers whether a contemplated act should or should not be done. Premeditation is where the intention to do an

act has been formed before the attempt to execute it. It implies a prior intention to do the act in question; and it is claimed by appellant's counsel that there is no proof whatever that there was any deliberation or premeditation on part of the accused to take the life of the deceased; that his first connection with the crime, so far as the evidence discloses it, begins with the uplifted hatchet when he was in the act of striking the deceased; and that the intention to kill might have been formed at that instant upon a sudden heat of passion caused by an indignity offered to the idol which was the object of his worship.

Direct proof of deliberation and premeditation is not required under our statute, but may be inferred from proven facts; and in the case under consideration we think the evidence of a predetermination to take the life of deceased is very strong.   The fact that in a house of worship, heathen though it was, two or three men should be armed with deadly weapons, is a very unusual thing.   This was followed, as the evidence of the state tended to prove, by the appellant raising his hatchet behind the back of the deceased, and striking him a blow without saying a word.   Simultaneous with this assault two shots were fired in rapid succession by the other defendants.   Under these circumstances, we think the jury were warranted in coming to the conclusion that there was not only a preconcerted design to take the life of the deceased, but that this design was formed in cold blood.   If the appellant was guilty at all, we can hardly see how they could have come to any other conclusion than that he was guilty of murder in the first degree.

While giving the charge to the jury, the court, in explaining to them what was required to show a premeditated design, said: "If a man, without uttering a word, should strike another in the head with an ax, it must be deemed a premeditated violence," and an exception was taken to this remark.   This paragraph must be taken in connection with the surrounding circumstances of the case as they were disclosed to the jury by the evidence, and it must be viewed in the light of the facts as they appear in the bill of exceptions.   The court doubtless intended to convey to the jury

this idea, that if they believed the accused came up behind the deceased, and without uttering a word, struck him a deadly blow with an ax or hatchet, it would be presumed to have been done with premeditated violence. It was merely a mode of illustration to show what was required to constitute premeditation, and, we think, could not in any way have misled the jury.

Taken altogether, we find no error in the proceedings or the charge of the court, and it is ordered that the cause be remanded to the circuit court for further proceedings to carry the sentence of the court into effect.