AFFIRMED.

THE other judges concur.

---

ED. D. NEAL v. STATE OF NEBRASKA.

[FILED JUNE 29, 1891.]

1. **Statutes:** INOPERATIVE AMENDMENT. The county board of Douglas county not having complied with the provisions of the act of the legislature, entitled "An act to provide for the manner of selecting, drawing, and summoning grand and petit jurors in counties having a population of seventy thousand (70,000) or more, to prescribe the qualifications of such jurors, to provide for the punishment of persons seeking to serve as jurors or seeking to have other persons selected as jurors, and to repeal sections six hundred and fifty-eight (658), six hundred and fifty-nine (659), six hundred and sixty (660), six hundred and sixty-one (661), and six hundred and sixty-five (665) of the Code of Civil Procedure, and all acts and parts of acts in conflict herewith," approved March 30, 1889, *held*, that sections six hundred and fifty-nine, six hundred and sixty, six hundred and sixty-one and six hundred and sixty-five of the Code of Civil Procedure remain in force in that county.

2. **Review:** EVIDENCE OMITTED FROM BILL OF EXCEPTIONS. Neither a certificate of the clerk of the district court, showing in what proportion the names of the persons upon the list from which the petit jurors were drawn were selected from the several wards and precincts of D. county, nor a certificate of the county clerk, showing the number of votes returned as cast in the respective wards and precincts of said county, such certificates not having been made a part of a bill of exceptions, will be considered in an appellate proceeding in this court.

3. **Jury:** VIEW: PRISONER'S RIGHT TO BE PRESENT: WAIVER. During the trial the jury were sent, under charge of an officer to visit the place where the crime was committed. Neither the judge, the clerk, the attorneys nor the defendant accompanied

them. The record shows that "the defendant having by his counsel in open court and in his presence waived his, defendant's, personal presence at the place of killing during the inspection thereof by the jury, he is (was) taken to jail." *Held*, No ground for reversing the judgment. See *State v. Adams*, 20 Kan., 311.

4. **Murder:** EVIDENCE. When two persons are murdered at the same time and place, under circumstances evidencing that both murders were committed by the same person, and were part of the same transaction, evidence as to the circumstances of the murder of one, especially of the finding of the body and what its condition as to wounds or marks of violence, is admissible on the trial for the murder of the other. See *Brown v. Commonwealth*, 76 Pa. St., 319.

ERROR to the district court for Douglas county. Tried below before CLARKSON, J.

*Gurley & Marple,* and *Lee S. Estelle,* for plaintiff in error:

The right of the prisoner to be present at the time the jury viewed the premises was one which he could not waive. (*Carroll v. State,* 5 Neb., 35 ; *Burley v. State,* 1 Id., 391 ; 1 Chitty's Crim. Law, 700, 720 ; *Fraedrich v. Fliette,* 25 N. W. Rep. [Wis.], 28 ; *State v. Bertin,* 24 La. Ann., 46 ; *Benton v. State,* 30 Ark., 328 ; *Sneed v. State,* 5 Id., 432 ; *Cole v. State,* 10 Id., 318 ; *Sweeden v. State,* 19 Id., 209 ; Thompson, Trials, sec. 893 ; *Washburn v. R. Co.,* 59 Wis., 364 ; *Nomaque v. People,* Breese [Ill.], 145 ; *Dempsey v. People,* 47 Ill., 325 ; *People v. M'Kay,* 18 Johns. [N. Y.], 217 ; *Canceimi v. People,* 18 N. Y., 128 ; *Hopt v. Utah,* 110 U. S., 574 ; *Dougherty v. Com.,* 69 Pa. St., 286 ; *Maurer v. People,* 43 N. Y., 1 ; *People v. Perkins,* 1 Wend. [N. Y.], 91.)

*George H. Hastings, Attorney General, contra,* cited, on the question of waiver: *State v. Adams,* 20 Kan., 311 ; *State v. Ah Lee,* 8 Ore., 214 ; *People v. Bonney,* 19 Cal., 426 ; *State v. Congdon,* 14 R. I., 458 ; *State v. Buzzell,* 59

N. H., 65; *McCorkle v. State*, 14 Ind., 39; *Hill v. State*, 17 Wis., 697; *People v. Murray*, 5 Crim. Law Mag., 233; *Bulliner v. People*, 95 Ill., 394; *McKinney v. People*, 2 Gilm. [Ill.], 556; *Chase v. People*, 40 Ill., 356; *Com. v. Webster*, 5 Cush. [Mass.], 295; *Blythe v. State*, 24 N. E. Rep. [Ohio], 268; *State v. Polson*, 29 Ia., 133; *Ray v. State* 1 G. Green [Ia.], 316; *Bishop v. State*, 9 Ga., 121; *State, v. Adams*, 20 Kan., 311; *Carroll v. State*, 5 Neb., 31; *O. & R. V. R. Co. v. Walker*, 17 Id., 436; *Gagg v. Vetter*, 13 Am. Rep., 322; *Heady v. Vevay*, 52 Ind., 117; *Close v. Samm*, 27 Ia., 503; *Jefferson R. Co. v. Bowen*, 40 Ind., 545; *Shular v. State*, 105 Ind., 294; *Indianapolis v. Scott*, 72 Id., 196.)

COBB, CH. J.

·The plaintiff in error, whose full Christian name does not appear in the record, was informed against as Ed. D. Neal, with a number of aliases, at the district court for Douglas county, at the February term, 1890, charged with the crime of murder in the first degree in the homicide of one Allen Jones, on the 4th day of February, 1890, in said county of Douglas. At the May term of said court in the said year he was put upon his trial under said information, was tried, convicted of murder in the first degree, and sentence of death passed upon him by the said court. The record and petition in error in said cause having been filed in this court, the execution of said sentence is stayed by force of the constitution.

The first assignment discussed by counsel in the brief is numbered 10 in the petition in error, and is as follows:

10. The court erred in overruling the motion to quash the regular panel of jurors.

Previous to March 30, 1889, the law in force providing for the selection, drawing, and summoning of grand and petit jurors was as found in sections 658, 659, 660, and

665 of the Compiled Statutes of 1887, which sections are here copied:

"Sec. 658. In each of the counties in this state, wherein a district court is appointed or directed to be holden, the county commissioners of the county shall, at least fifteen days before the first day of the session of the court, meet together, or any two of them may meet, and select sixty persons possessing the qualifications prescribed in section six hundred and fifty-seven, and as nearly as may be a proportionate number from each precinct in the county, and shall, within five days thereafter, furnish to the clerk of the district court of the county, or his deputy, a list of the names of the persons selected.

"Sec. 659. The clerk or deputy clerk receiving the names shall write the name of each person selected on a separate ticket, and place the whole number of tickets into a box, or other suitable and safe receptacle, and shall preserve the list of names furnished by the commissioners, in the files of his office.

"Sec. 660. The clerk of the district court or his deputy, and the sheriff or his deputy, or, if there be no sheriff or deputy sheriff, the coroner of the county, shall, at least ten days before the first day of the session of the district court, meet together and draw by lot out of a box, a receptacle wherein shall be kept the tickets mentioned and referred to in section (659) six hundred and fifty-nine of said title, twenty-four names, and the persons whose names are drawn shall be the petit jurors. And when a grand jury is ordered, the clerk or deputy clerk, and sheriff or deputy sheriff, or coroner if there be no sheriff or deputy sheriff, shall then draw sixteen (16) additional names, and the persons whose names are drawn shall be the grand jury.

"Sec. 661. The clerk shall, on the day of the drawing aforementioned, issue an order to the sheriff, deputy sheriff, or coroner, as the case may be, commanding him to summon the persons whose names are drawn as petit jurors to

appear before the district court at or before the hour of eleven o'clock on the morning of the first day of the term, stating in the order the day of the week and month, and the place of the sitting of the court, to serve as petit jurors, and a like order, commanding the sheriff, deputy sheriff, or coroner to summon the grand jury when a grand jury has been ordered and drawn."

At the session of the legislature of 1889, there was passed, and which provides upon its face to take effect on the 30th day of March of that year, an act, entitled "An act to provide for the manner of selecting, drawing, and summoning grand and petit jurors in counties having a population of seventy thousand (70,000) or more; to prescribe the qualifications of such jurors; to provide for the punishment of persons seeking to serve as jurors or seeking to have other persons selected as jurors, and to repeal sections six hundred and fifty-eight (658), six hundred and fifty-nine (659), six hundred and sixty (660), six hundred and sixty-one (661), and six hundred and sixty-five (665) of the Code of Civil Procedure, and all acts and parts of acts in conflict herewith."

The purview of this act is too long to admit of being copied here; I will state, therefore, its general features, which are to the effect that in all counties having a population of 70,000 or more, it was made the duty of the county board, instead of selecting the sixty persons as provided in section 658 above, to make a list of a sufficient number, not less than one-tenth of the legal voters of each town or precinct in the county, to be known as the jury list. Also, that at the meeting of the county board in the respective counties having a population of 70,000 or more, in January, 1889, and each year thereafter, said board should select from such list a number of persons equal to one hundred for each trial term of the district court and other courts of the district provided by law to be held during the succeeding year; that in making such selection, they should

choose a proportionate number from the residents of each town and precinct and should take the names of such only as are:

First—Inhabitants of the town or precinct not exempt from serving on juries.

Second—Of the age of twenty-one years or upwards and under sixty years old.

Third—In the possession of their natural faculties.

Fourth—Free from all legal exceptions, of fair character, of approved integrity, of sound judgment, well informed, and who understand the English language.

Section 6 of said act provides "That a list of jurors so selected shall be kept in the office of the county clerk, who shall write the name and residence of each person selected upon a separate ticket and put the whole into a box or wheel to be kept for that purpose."

Section 7 provides for the drawing by the clerk of such court in the presence of the county clerk, from the said box or wheel, the names of a sufficient number of said persons, not less than thirty for each two weeks that such court will probably be in session for the trial of law cases, to constitute the petit jury for that term, and where there is an additional judge in such court, a like number for each additional judge requiring a jury, unless such court shall otherwise order, with other provisions, and a proviso, that whenever there shall be pending for trial in any of said courts, any criminal cause wherein the defendant is charged with a felony, and the judge holding said court shall be convinced from the circumstances of the case that a jury cannot be obtained from the regular panel to try said cause, such judge may, in his discretion, prior to the day fixed for the trial of said cause, direct the clerk to draw (in the manner as the regular panel is drawn) not exceeding one hundred names as a special panel from which the jury may be selected to try said cause.

There are many other special provisions not deemed necessary to enumerate. Section 14 is here copied at length:

"Sec. 14. Section six hundred and fifty-eight (658), six hundred and fifty-nine (659), six hundred and sixty (660), six hundred and sixty-one (661), six hundred and sixty-five (665) of the Code of Civil Procedure, and all acts and parts of acts in conflict herewith, shall be repealed so far as respect counties having a population of seventy thousand (70,000), or more; *Provided,* That the existing law relating to juries shall be in effect of the respective counties until such time as the county boards of the respective counties having a population of seventy thousand (70,000), or more, shall have complied with the provisions of this act."

It appears from the bill of exceptions that as a foundation for his motion to quash the regular panel of jurors, the plaintiff in error, by his counsel, called and examined Frank E. Moores, clerk of said court, as to the manner of selecting and drawing the jury then in attendance upon said court. Upon the evidence of this witness, it appeared that on the first day of May, 1890, there were drawn by the sheriff and clerk of the district court of said county, sixty names of jurors to serve as petit jurors for the said term, and that the method of drawing the same was that the county commissioners handed to the said clerk sixty names, and that he made sixty slips, each slip containing one of the names handed to him by the county commissioners. These sixty slips were put into a square box and shaken up, whereupon the said sheriff proceeded to take one out at a time and hand it to the clerk, who put down the name drawn; and that the population of said county was at that time seventy thousand and over.

By this evidence it was sufficiently established that the jury then present, and from whom the twelve jurors which tried the plaintiff in error was selected, were drawn, and summoned, without regard to the act of 1889 and in substantial compliance with the provisions of law as contained

in the section of the Code as above copied. Also, upon
overruling the motion, the court said, as appears by the
bill of exceptions: "The motion will be overruled, for the
reason that the new law has not been adopted by the
county commissioners, and if adopted would be impracti-
cable so far as the working of this court is concerned, and
put an end to the business of this court."

The question. here presented is whether, notwithstand-
ing the repealing clause contained in section 14 of the
act of March 30, 1889, the provisions of sections 658, 659,
660, 661, and 665, of the Code of Civil Procedure, still
remained in force and effect in the county of Douglas at
the date of the trial of the accused.

I think there can. be no doubt that it was the intention
of the legislature in passing this act, that the provisions of
the statute as they then stood should remain in full force
throughout the state until the county board of the county,
as there was but one then having a population of 70,000
or over, should put in operation the act then passed, by
selecting the list of jurors and taking the other measures
therein provided for in accordance with its provisions.
That they had not done this at or before the date of the
trial is substantially proved by the evidence offered on the
part of the accused. If this had been done, I think it
was incumbent upon the accused to show that fact in order
to sustain his motion.

The question is not before the court as to the binding
force of a statute, where the going into effect of its provis-
ions is made dependent upon the action of somebody or
board other than the legislature itself.

The cause of the plaintiff in error, so far as this point is
concerned, depends upon his sustaining the act and invali-
dating the proviso. This I think he has failed to do. The
whole act must be construed together, and at least as much
effect given to the proviso as to the balance of the act.

Counsel also contends that his motion to quash the panel

should have been allowed even if it be true that under the law the jury might have been selected and drawn under the old law, and in support of this he presents a paper purporting to be the certificate of P. O'Malley, county clerk, showing the number of votes cast in each precinct and ward of Douglas county at the general election of 1888; also a paper purporting to be a certificate of Frank E. Moores, clerk of the district court, showing that the list of sixty names which he received from the county commissioners of said Douglas county, from which the petit jury for the May term of 1890 was to be drawn, contained the names of so many residents, setting them out in full, of each precinct and ward of said county, from which papers counsel in the brief draws the conclusion that said jury was not properly chosen under the old law, the proportionate number thereof not being taken from each precinct and ward of the county.

These certificates, being attached to the record proper and not being contained in either of the bills of exceptions, cannot be considered as a part of the record by this court, it being a settled law of this court that an affidavit or the certificate of an officer, in order to be considered in support of a proceeding in error, must be made a part of the bill of exceptions in the case. The cases in which this has been substantially held are so numerous as to render a citation of them unnecessary. This assignment must therefore be overruled.

The next question presented and discussed in the brief of counsel is that arising upon the eleventh, thirteenth, fourteenth, and perhaps other of the assignments, and out of the fact that the court, upon the motion and request of the district attorney, permitted the jury to view the premises where the body of Allen Jones had been found, otherwise designated as the scene of the commission of the crime for which plaintiff in error was then upon trial, without said jury being accompanied by the accused.

It appears from the bill of exceptions that after the jury had been selected, agreed upon, and sworn, Mr. Mahoney, the district attorney, addressing the court, said:

"Before calling any witnesses in this case I desire to move the court for an order directing that the jury be taken in charge of the proper officer, and under proper instructions, to view the premises, the scene of the tragedy, in order that they may the better understand the testimony as it will be introduced. I desire that they go now before any testimony is offered, so that when the first testimony is offered they will understand the situation and no break will have to be made afterwards."

The record continues:

By the Court: Any objection to that?

By Mr. Gurley: No objection, and we waive the right of the prisoner to be present at the premises.

By the Court: The jury then may be conducted to view these premises in charge of the sheriff. Is there any particular person whom you would suggest to show the premises to the jury?

By Mr. Mahoney: No, sir. I presume probably the sheriff will be the proper—the sheriff or the bailiff—person to have in charge of the jury. The court will give the officer as well as the jury proper instructions.

By the Court: Yes, sir; that will be the order of the court, and I will instruct the officer before he proceeds with the jury as to what he shall do. I think in this case the sheriff should have charge of the jury, in connection with the officer that has them in charge thus far, and the sheriff will be the one to point out the premises to the jury and he will understand that they must converse with no one while viewing the premises, and no outsider must be allowed within a speaking distance of them, and no one but the officer and the sheriff who has charge of the jury.

By Mr. Mahoney: I presume that will occupy the entire afternoon.

By the Court: That will occupy the entire afternoon. The witnesses called here for this afternoon will be excused for this afternoon, but will report here at 9:30 o'clock to-morrow morning.

Before leaving the court room to visit the farm and to examine the premises, the court instructed the jury as follows:

"Gentlemen of the Jury: You are about to visit the premises where this tragedy occurred, and while there viewing the premises you must obey the injunction that I have heretofore given, that is, that you must talk to no one on the subject of this case, and you must suffer yourselves to be addressed by no one on the subject of the case. If, through inadvertence of some sort, some one should be talking about it in your presence, you must close your ears to it. You must read no newspapers so long as this trial lasts, and you must refrain from forming any opinion on the subject of the case until it is finally submitted. Keep yourselves as far as possible from any kind of contact with outsiders, and the officer of this jury must see that these instructions are carried out, and must himself say nothing to the jury on the subject of this case further than simply to aid them in viewing the premises. Are the attorneys for the defendant here?

Mr. Gurley, Mr. Estelle, and Mr. Mahoney were all present.

By the Court: Is there any objection to that?

By Mr. Gurley: No objection.

The jury were now conducted to view the premises as per the order of the court above mentioned, and the court adjourned until Friday morning, May 16, 1890, at 9:30 o'clock.

Counsel for plaintiff in error presents an argument to invalidate the bill of exceptions, or, in other words, the court's account of the proceedings in relation to the sending out of the jury to view the premises. They also present

in the record a journal entry prepared by them stating such proceedings somewhat different from that contained in the bill of exceptions.   The court cannot consider anything tending to invalidate or contradict the facts as stated in the bill of exceptions; on the other hand, the record, including the bill of exceptions, is and must be received by this court as an absolute verity.   Accordingly, we cannot consider the affidavits or reporter's notes as presented to the court below, either in support or in resistance of the motion of plaintiff in error for a journal entry ; and this, notwithstanding the desire, as expressed by the trial judge, that the whole proceeding relative to the motion be incorporated in the record, and notwithstanding the claim of counsel that they were so incorporated.

There is, however, a journal entry in the record to the effect that upon the court sending out the jury in a body in charge of the sheriff to the place of the commission of the crime to view the same as it should be shown to them by Lewis Grebe, and the defendant, having by his counsel, in open court, and in his presence, waived his, defendant's, personal presence at the place of the killing during the inspection thereof by the jury, " he is taken to jail."

The facts of the case must then be considered, for the purpose of this assignment, to be :

That upon said order being made, the plaintiff in error, through his counsel and in his presence, expressly waived his right to accompany the jury when making such view, and that while the jury was absent from the court under said order, the plaintiff in error was conducted to and confined in jail.

Four cases have been brought to the attention of the court by counsel on one side or the other where this precise point has been presented to courts of last resort.   In two of them, *Benton v. State*, 30 Ark., 328, and *State v. Bertin et al.*, 24 La. Ann., 46, the convictions were reversed, while in those of the *State v. Ah Lee*, 8 Ore., 214, and the

*State v. Adams,* 20 Kan., 311, the convictions were sustained.

In the latter case the opinion of the court is by Mr. Justice Brewer.   His opinion is exhaustive of the question, and the statute of that state being substantially identical with the provisions of our own upon the point involved, I adopt the conclusions and judgment of that court rather than enter upon an independent line of discussion of the authorities and reason of the case.   This assignment is also overruled.

The nineteenth assignment of error, and the last one argued by counsel for plaintiff in error in the brief, is:

"That the court erred in admitting the evidence of C. P. Harrigan relative to the finding of the body of Dorothy Jones, and in admitting all of the testimony of C. P. Harrigan relative to the finding of her body."

I here quote the evidence of this witness admitted under objection, and to which this assignment is applicable.

C. P. Harrigan, coroner Douglas county, called as witness by state.   Examined by Mr. Mahoney, county attorney.   Testified on direct examination as follows:

Q. Did you make an examination of the premises on the Pinney farm at the time you found the body of old man Jones there?

A. Yes, sir, somewhat.

Q. What else did you find there upon the place at that time?

A. I found the body of Dorothy Jones.

Q. Where was that body at the time you got there?

Objected to, as incompetent, immaterial, and irrelevant. Objection overruled and defendant excepts.

A. The body of Dorothy Jones was lying on the side of the straw stack east of where the body of Allen Jones was found.

Q. In what condition was it?

A. In a state of *rigor mortis* and stiffened; that is, the

muscles were all contracted and the body had evidently been dead for some time.

Q. Was it dead at that time?

A. Yes, sir.

Q. How close to the straw stack or hay stack was it lying?

A. Immediately to the base of the stack.

Q. On which side of the stack?

A. On the west side of the stack.

Q. Anywhere near another barn?

A. Only a short distance, as I remember. I would not be positive as to that.

Q. From what barn.

A. From the barn where the body of Allen Jones was found.

Q. Do you recollect how the body of Dorothy Jones was dressed at that time?

Objected to, as incompetent, immaterial, and irrelevant. Objection overruled and defendant excepts.

A. The body was dressed in a calico dress, and also a man's overcoat—a cheap overcoat—and the head was cov-ered with a hood, and the feet covered with overshoes or arctics.

Q. I wish you would examine these two pieces of coat, and state whether or not you recognize them. (Exhib-iting a coat.)

A. Yes, I recognize both of them.

Q. What coat is that.

A. It is the coat that was upon the body of Dorothy Jones.

*        *        *        *        *        *        *

Q. What wounds, if any, did you find at that time in your examination upon the farm, upon the body of Dor-othy Jones?

Objected to as incompetent, immaterial, and irrelevant. Objection overruled and defendant excepts.

A. I found four wounds upon the body.

Q. Whereabouts?

A. There were eight; four upon the back and four upon the breast.

Q. I wish you would locate the four wounds upon the back?

A. Well, I do not know as I can give it accurately.

Q. I do not care for it exactly, as nearly so as you can.

A. There was two of them in pairs; one was immediately above the other, on the right side of the spinal column, immediately above, I should judge, about the fifth or sixth rib; and there were two others about five and a half inches to the inner side and on the same side—the left side of the spinal column, which would be about the middle of the seventh and eighth ribs.

The scene of the murder for which the defendant was on trial was a farm owned by Dr. Pinney, of Council Bluffs, some seven or eight miles southwest of the city of Omaha. It appears that this farm had been for a short time unoccupied except by a hired man of Dr. Pinney, when on the 30th day of January, 1890, A. D. Cadwalader, of the vicinity of Council Bluffs, having made arrangements to lease the said farm, not being ready to take personal possession of it, arranged to have the place occupied for the time being by Allen Jones and his wife Dorothy, the father-in-law and mother-in-law of Cadwalader, they being at that time temporarily residing at the residence of their son N. J. Jones at Irvington, Douglas county.

On the 30th of January, Cadwalader, together with Allen and Dorothy Jones, went from Irvington to the Pinney farm, Jones taking with him his two horses and a wagon and some bedding and clothing. One of these horses was a dark or black horse, the other a bay, blind horse, of about eleven and twelve hundred pounds weight. It seems that the hired man of Dr. Pinney having left the farm a few days before, his place had been temporarily supplied

by the deaf son of Mr. Cadwalader. The next morning after the arrival of Cadwalader and Allen and Dorothy Jones at the farm, Cadwalader with his son returned to their home near Council Bluffs; the old people, the Joneses, went with them as far as the grocery store on the road to Omaha for the purpose of buying some supplies, and returned immediately to the farm. Mr. Cadwalader was back at the farm again on the 3d day of February following; he left there about 3 o'clock P. M. of said day, leaving the old people, Allen and Dorothy Jones, there and no other person there. There was at that time, besides the two horses belonging to Jones, eight head of cows, a couple of calves, one small calf and one a yearling, and eight head of horses belonging to Dr. Pinney.

Allen Jones was at this time a man about seventy-two years of age. I believe the record does not show the exact age of Dorothy Jones. They were both persons in good health, both physically and mentally. They had no acquaintances in that neighborhood. On the 10th day of February following, Mrs. Demmis Cadwalader, the wife of A. B. Cadwalader and the daughter of Allen and Dorothy Jones, together with her son Ira Cadwalader, went from their home east of Council Bluffs, Iowa, to the Pinney farm, arriving there between sundown and dark. They went into the house but found no one there, but found the house so far as furniture, bedding, stove, fire-wood, provisions and everything about the house in order except from the effect of freezing, the same as though the inmates of the house had just stepped out. Neither did they find any horses, cattle, or stock of any kind on the place, but the stables and provender were in a condition indicating that while in the act of feeding and caring for the stock, the persons attending to that duty had been suddenly called away and the stock removed. They were unable to find any tracks either of human being or stock, indicating in what direction or in what manner either the human beings

or stock had left the place. Mrs. Cadwalader and her son remained there all night and early in the following morning returned to their residence near Council Bluffs. Mrs. Cadwalader immediately wrote to her brother, N. J. Jones, at Irvington, no doubt informing him of the condition of things at the Pinney farm as found by her. This letter was received by N. J. Jones about noon on Wednesday, the 12th day of February, at his residence at Irvington. He immediately proceeded to the Pinney farm, arriving there between 3 and 4 o'clock of that afternoon. He went into the house, also into the yards, barns, and stables, and found substantially the same condition of things as found by his sister on the 10th. He then went to South Omaha and from thence to his home. On the next day he went to his sister's, Mrs. Cadwalader, near Council Bluffs. Went to see Dr. Pinney, and between 12 and 1 o'clock of that day started from there and went back to the Pinney farm accompanied by Frank Cadwalader and Arthur Phillips. These three arrived at the Pinney farm about sundown. They found nothing different from that which he had found the day before except the tracks of a lady that had passed through the yard. They remained there all night. The next morning they renewed their search, as the witness Jones expressed it, "all over the farm" and found nothing. Returning to the house they met some gentlemen that had come over together, with whom they returned to the barn, and having examined it again they started to the house for the purpose of making grab hooks to drag the well, when one of the gentlemen above referred to, a young man named Pickard, together with another man by the name of Waggoner, found the body of Allen Jones. The body was lying in a manure pile on the east side of the barn, close to the barn, his body partially covered up with manure. When witness was called to the body just his legs were uncovered. These two young men who had found the body, uncovered his

whole body.   After further search and turning over the manure piles with a pitch fork, Frank Cadwalader found the body of Dorothy Jones.   This body was found on the west side of the hay stack, east of the east barn and about two rods distant therefrom, covered with hay and a board and a ladder thrown upon the top of the hay.

It appears that the coroner of the county, Dr. C. P. Harrigan, was immediately notified, and together with Dr. Pinney, repaired to the Pinney farm.   Arriving there found a number of people, including N. J. Jones, the son of the deceased, the witness above referred to.   The coroner being called as a witness at the trial, and having stated the fact of having been notified and proceeded to the Pinney farm as above stated, stated that he there found the body of Allen Jones, and the condition in which the body was found ; found two bullet holes in the body ; identified the clothing found on the body, and located the gun-shot wounds, both in the clothing and in the body ; stated that he had the body removed to the establishment of an undertaker in Omaha, where, the inquest was held.

Then follows the evidence in relation to the finding of the body of Dorothy Jones and its condition, which was objected to and made the foundation of the exception we are now considering.

The evidence tends to show that the accused, Ed. D. Neal, appeared at the Wisconsin House in South Omaha on Monday, February 3, at about 10 o'clock in the forenoon. Stayed there over night as a guest of the said house, but without registering; whether there was a register in which the guests at that house usually registered does not appear. He was again seen by a witness the following day, Tuesday, the 4th of February, at 10 or 11 o'clock in the forenoon, crossing Farnham street, Omaha, with a gun.   The direction in which he was going was that which led to the road leading to the Pinney farm.   Another witness testifies to having seen him on the road about fifty yards from the house on

the Pinney farm before 12 o'clock on the 4th of February.
On the evening or night of the same day he made his
appearance at Carpenter's livery stable in South Omaha
riding a small dark colored horse.   The plaintiff in error,
upon appearing at Carpenter's livery stable, and also at
Davis's livery stable, expressed himself to the two livery
stable keepers and their hired men, that he wanted to hire
two men and two horses to drive some cattle and horses,
which he said he had on a farm about three miles and a
half west, from that point to South Omaha; that he had
been living and keeping batch and farming at said farm
for about two years, and was tired of that life and wished
to bring said stock into South Omaha and dispose of it
and quit the business.   He engaged the witness Jerry Dee
and the witness Theodore Mott and two horses, one from
each of said livery stables, to go with him the next morn-
ing and assist in driving in the said horses and cattle.
The next morning Neal, Dee, and Mott started on horse-
back from South Omaha for the above expressed purpose,
Neal riding the said small, dark colored horse, Mott one
of Carpenter's horses, and Dee one of Davis's horses.  The
horse which Mott started to ride being a broncho and not
a good rider, and Mott, being somewhat lame, found it
disagreeable to ride him, whereupon Neal changed horses
with him, riding Carpenter's horse, and Mott riding the
small, dark colored horse.   In this manner they proceeded
to the Pinney farm.   Arriving there they found the large,
bay, blind horse in one of the stalls, the other horses and
cattle in the stock field, with some exceptions.   Among
other exceptions, a young calf, which was in one of the
cow barns.   Neal had stated, among other things, to his
companions in going out, that he was a butcher, or, as he
expressed it, "a pig sticker."   Upon arriving there the
first thing he did was to procure a rope and tie the calf,
preparatory to putting it in the wagon, to which, under
his direction, Mott and Dee had harnessed and attached

the team, consisting of the small, brown horse which Mott had ridden out there, and the large, bay, blind horse which they had found in the stall, Neal directing them how to place them in the wagon in reference to which should work on the nigh and which on the off side. Neal being about to throw the calf into the wagon, Dee suggested to him that they ought to put some hay under the calf, and started towards a pile of hay for the purpose of throwing some of it into the wagon bed, whereupon Neal stopped him, saying that that hay was too good to put under a calf, and went himself to the other side of the stack and cut off some hay and brought it for that purpose and threw it into the wagon, on which he placed the calf. Neal then, with assistance of Dee, caught up a portion of the other horses, which they found in the stock field, and tied a part of them together and attached them to the rear of the wagon, the others, together with the cattle, they drove loose, and in this manner returned to South Omaha, Neal urging Mott, who drove the wagon, to drive at a swift pace, as it was necessary that he should get there early.

Having arrived at South Omaha, they drove the cattle into a public stock yard there and took the horses to Davis's livery stable and put them up. Either on that day or the next, Neal sold nine of these horses, including the small dark-colored horse, but reserved the large bay blind horse, to Davis for $245 in money; swapped the wagon for a saddle with Davis and also gave him the old harness, stating that it was not of much use to him and he would have to hire somebody to carry it to Council Bluffs, and in trading for the saddle he stated that he wished to ride to Council Bluffs, and that he had no way to take the wagon either.

He also sold the cattle to a Mr. Townsend, having first employed Townsend to sell them for him as his agent, and having stated that he had agreed to place them in the hands of Boyer Bros., but said as he couldn't find them he

wanted witness Townsend to sell the cattle for him, but afterwards sold them to Townsend—ten head of cattle, including cows and calves, for $112.50—receiving the pay in checks, which he had cashed at the Union Stock Yards Bank, of South Omaha.

At the time Neal first made his appearance in South Omaha, on horseback, until his return there with the horses and cattle, he wore an overcoat, which Mr. Davis identified, the same being produced in evidence. This overcoat he left at Davis' livery stable, stating that he didn't want it any longer, and that some of the boys at the stable might have it. It remained there until taken possession of by the officers. After completing the trade with Mr. Davis he took him to the saloon and treated him and drank with him, afterwards at Mr. Davis's treat, and again treated him—the accused uniformly drinking pop.

It further appears in evidence that the accused, Ed. D. Neal, on the 6th day of February, went into the jewelry store of the witness, H. Copert, at South Omaha, and bought from witness a lady's gold watch and chain and an 18-carat gold ring, paying therefor $65 for the watch and chain, and $9.50 for the ring, also paying Mr. Copert for the same in part an old gold ring. This ring was produced in court and identified as the ring which Dorothy Jones wore at the time she left the residence of her son at Irvington on the 29th day of January.

That Allen Jones was murdered there can be no doubt; there can be just as little, in view of the facts proved, that the object of his murderer was to obtain such possession of the horses and cattle then under his charge as would enable him to convert them into money before detection. In order to accomplish this object and purpose the murderer must not only dispose of Allen Jones and conceal his body, but must also dispose of his wife Dorothy, because, while she was alive and at liberty, she would find some means of obtaining help and secure the detection of his

murderer, and she would also make such a fight for the possession of the cattle and horses as would inevitably frustrate the design of the robber. Again, Dorothy Jones was the last person seen in company with the murdered man. As long as she remained unaccounted for, her death unproven, the mind would naturally fix upon her as the person responsible for his murder; but when her body is found, and shows unmistakably that she was also the victim of murder, then the mind looks otherwheres for the murderer of Allen Jones, and naturally connects the two murders together. Therefore, for the purpose of showing to the jury that Allen Jones was not murdered by Dorothy Jones, the person last seen in his company alive, it was admissible, and I think necessary, that evidence should be given not only of the finding of the body of Dorothy Jones, but of the place where it was found, and all its conditions indicating or tending to indicate in what manner she had come to her death. Certainly not for the purpose of exciting the minds of the jury by the exhibition of evidence of crime or of great atrocity, but to give them the most intelligent view of the circumstances under which these two human beings had been deprived of life. And that, too, for the purpose of enabling them to decide the truth or falsity of the charge of murder in taking the life of Allen Jones against the defendant then on trial.

The case of *Brown v. Commonwealth*, 76 Pa. St., 319, was a case in some of its features like the case at bar. The court, in the opinion in that case, after stating the law to be, "That the commission of a distinct offense, even similar in character, cannot be given in evidence against the prisoner," as held in the case there cited, continues: "But when two persons are murdered at the same time and place, and under circumstances evidencing that both acts were committed by the same person or persons, and were part of one and the same transaction or *res gestæ*, and tend to throw light on the motive and manner of the murder for which

the prisoner is indicted, the case is different,   *   *   *
and the motive, to-wit, robbery, being one and the same
which led to the murder of both at the same time, being
parts of the same *res gestœ*, they together tend to throw
light on each other, and there is no reason that the truth
should be thrown out by excluding the evidence objected
to."

There are two other, but I confess minor reasons, for
the admission of this evidence.

First—The witness Jerry Dee testifies that when wit-
nesses Neal and Mott were at the Pinney farm preparing
to remove the cattle and horses, that Neal tied up the
young calf for the purpose of putting it in the wagon, when
witness spoke to him, saying that he had better put some
hay in for the calf to lie on, and witness started for the
haystack for the purpose of getting hay for that purpose,
there being some loose hay lying at the foot of the stack;
that Neal being then right near the wagon, as witness got
up near to the stack, said, "that hay was too good to put
under a calf," and he, Neal, immediately went around to the
other side of the stack and got hay which he put under
the calf in the wagon.   Now, it appears from the descrip-
tion of the place where this circumstance occurred by the wit-
nesses Dee and Mott, as well as that where the body of Dor-
othy Jones was found by the witness C. P. Harrigan, that
if Neal had not stopped Dee when he first went to get the
hay to put under the calf that he would, in all probability,
in raking up the hay for that purpose, have disclosed the
remains of Dorothy Jones, where she had previously been
hidden by her murderer.   This is a circumstance, simple,
it may be admitted, but tending to fix the identity of the
man Neal, who was there engaged in carrying away this
property, as the man who placed the body of Dorothy
Jones there, and for that purpose evidence of the finding,
and where, of the body of Dorothy Jones was admissible.

Second—It was proved by the testimony of Leroy Jones,

Neal v. State.

the grandson of Dorothy Jones, that at the time his grand-
mother left Irvington, on the 29th of January, she had on
her finger a small gold ring, and he identified the ring
which Neal bartered to the witness Copert, at South Omaha,
on the same day that he sold the cattle and horses, as that
ring.    In this he was corroborated by the evidence of John
Q. A. Jones, son of the deceased Dorothy Jones.    The
possession of this small gold ring by the accused, then on
trial, was an important link in the chain of testimony de-
veloped by the evidence, but in order to make it available
or of any value, there was another link necessary to be sup-
plied.    That was the fact that this gold ring, proven to
have been in the possession of Dorothy Jones, was not then
in her possession, dead or alive.    That link could only be
supplied by proof of the finding of her body, and its condi-
tion when found.    These circumstances amply satisfy my
mind, which I confess was first in doubt on this point.

At the close of the brief of plaintiff in error, attention
is called to the ninth assignment of error, which is based
upon the giving by the court of the following instruction
asked for by the state:

"During the progress of this trial you have visited the
scene of this alleged homicide..   This visit was wholly for
the purpose of enabling you to better understand the testi-
mony as it came from witnesses upon the stand and under
oath.    You are not to take into account in arriving at your
verdict any original information you may have acquired
while viewing the premises, for it is your duty as jurors
to try and determine this case upon the testimony adduced
and submitted here in open court, and the law as given you
in these instructions, and upon nothing else."

It is not my purpose to discuss the question or questions
of law involved in the giving of this instruction.    It is
deemed sufficient to say that the statute empowers a trial
court in its discretion to send out a jury to view the scene
of the commission of the crime, when the accused is on

trial for its commission. Doubtless the primary feature and the sole object of such view is to enable the jury, by the location of the ground, buildings, fences, or other inanimate objects at and near the scene of the acts constituting the crime which they are investigating, to apply the facts to be stated to them by witnesses. Whether the sight of these inanimate objects is to be considered evidence before the jury, is a question not deemed important to decide in this case, and it is not decided. It is not suggested, nor am I able to see, that by this instruction the plaintiff in error was or could have been deprived of anything which could have tended to his favor or benefit.

It is not suggested in the record or brief that the evidence fails to sustain the verdict. The judgment of the district court is affirmed. The prisoner will be executed, according to law, on the 9th day of October, 1891.

JUDGMENT ACCORDINGLY.

THE other judges concur.